# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DONNA SIMMONS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00048 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Donna Simmons, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2008). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Simmons protectively filed her current application[1] for SSI on August 18, 2005, alleging disability as of March 15, 2000,[2] due to arthritis in her back, a hernia and anxiety. (Record, ("R."), 356, 384.) The claim was denied initially and upon reconsideration. (R. 335-37, 341-43.) Simmons then requested a hearing before an administrative law judge, ("ALJ"), on February 8, 2007. (R. at 344.) The ALJ held a hearing on November 27, 2007, at which Simmons was represented by counsel. (R. at 607-47.)

By decision dated March 27, 2008, the ALJ denied Simmons's claim. (R. at 16-21.) After consideration of the entire record, the ALJ found that Simmons had not performed substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Simmons had severe impairments, namely a back disorder and anxiety, but he found that Simmons's medically determinable impairments did not meet or medically equal

---

[1] Simmons previously filed an application for SSI on May 6, 2002. (R. at 60-73.) The claim was denied initially and on reconsideration. (R. at 51-52.) An ALJ determined that Simmons was not disabled on June 9, 2003. (R. at 30-39.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied her request for review on January 29, 2004. (R. at 24-26.)

[2] Simmons amended her alleged onset of disability date to August 18, 2005, the date of her application for SSI. (R. at 611.)

one of the impairments listed at 20 C.F.R. § Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Simmons maintained the residual functional capacity to perform the requirements of a limited range of sedentary[3] work, whereby she could lift and carry up to 10 pounds occasionally, and five pounds frequently, sit for two hours at a time up to a total of six hours in an eight-hour period and stand and/or walk for 20 minutes at a time up to a total of two hours in an eight-hour period. (R. at 20.) The ALJ further found that Simmons was unable to perform jobs that require crawling, climbing stairs, exposure to heights or hazardous machinery, operating automotive equipment, exposure to dust, fumes or temperature extremes, or more than occasional bending, stooping or kneeling. (R. at 20.) Additionally, the ALJ found that Simmons was precluded from the performance of her past relevant work as a fast food worker, child care worker and grocery store clerk. (R. at 20.) The ALJ opined that, although Simmons could not perform the full range of work at the sedentary level of exertion, she retained the ability to perform a significant number of jobs in the national economy, such as a material handler, general production worker and inspector/grader. (R. at 21.) Thus, based on these findings, the ALJ determined that Simmons was not under a "disability" as defined by the Act and was not eligible for SSI benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued his decision, Simmons pursued her administrative appeals but the Appeals Council denied her request for review on August 8, 2008. (R. at 7-9.) Simmons then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See*

---

[3] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 416.967(a) (2008)

20 C.F.R. § 416.1481 (2008).  The case is before this court on Simmons's motion for summary judgment filed April 9, 2009, and on the Commissioner's motion for summary judgment filed April 22, 2009.

## II. Facts

Simmons was born in 1972, (R. at 352), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c).  Simmons has a high-school education, (R. at 627), and past work experience as a fast food worker, child care worker and grocery store clerk.  (R. at 383, 397.)

At the hearing, Simmons stated she had never had a driver's license and that her husband was disabled but working at McDonalds.  (R. at 616.)  Simmons testified that the last place she worked was at Wendy's where she performed numerous duties such as running the cash register, cooking and stocking the shelves.  (R. at 617.)  Simmons stated that stocking the shelves required her to pick up items weighing over 50 pounds.  (R. at 617.)  Simmons noted that she left her job at Wendy's in order to move to California to live with her boyfriend.  (R. at 619.)  She noted that when she moved back to Virginia several years ago, she did not try to get a job because she was three months pregnant.  (R. at 619.)  Although her daughter is now seven years old, Simmons stated that she never obtained a job due to her back pain.  (R. at 619.)  Simmons also testified that she worked at a preschool for several years during the 1990s.  (R. at 620.)

Simmons testified that she had trouble cleaning her house due to her back pain, which impaired her ability to sweep, mop and do dishes while standing.  (R.

-4-

at 621.)  Simmons noted that she could stand for about five minutes before her back pain forced her to sit down.  (R. at 621.)  In addition, Simmons testified that she was able to sit for 30 minutes to an hour before having to get up and walk around.  (R. at 621.)  She noted that sometimes her right leg went out from under her causing her to fall down.  (R. at 622.)  She stated that due to her legs, as well as a knife-like pain in her lower back, she had trouble climbing stairs.  (R. at 623.)  She noted that in order to get housework done, she had to really push herself through the pain.  (R. at 623.)  She stated that she spent most days playing computer games and watching television, although sitting in front of a computer caused her back to hurt.  (R. at 623-24.)  Simmons further noted that her back pain affected her memory and concentration to where she could not remember where she placed things, or would sometimes drop things she was holding on account.  (R. at 624.)

Simmons noted that she had been seeing Dr. Ali for almost a year for treatment of her back pain.  (R. at 624.)  Simmons noted that she underwent a magnetic resonance imaging, ("MRI"), of her back in May 2006.  (R. at 625.)  Simmons testified that Dr. Ali would not allow her to return to work, claiming that he informed her that her back condition could eventually require her to use a wheelchair.  (R. at 625-26.)  Simmons stated that she took Xanax for her nerves, and she explained that she often became nervous about various things such as her daughter and mother.  (R. at 626.)  Simmons noted that she lost her temper maybe once each month, which caused argument with her spouse.  (R. at 627.)  In addition, Simmons noted a bad relationship with her mother, which caused her to lose her temper.  (R. at 627.)

-5-

Simmons testified that she was in special education classes while in high school due to her poor test taking abilities and slow learning abilities. (R. at 627.) She noted that her learning difficulties impacted her performance at certain jobs, such as operating the cash register at Wendy's, noting that it took her a month to learn how to properly operate it. (R. at 628.) In addition, Simmons stated that her trouble with reading impacted her job working at a day care facility because she had trouble reading stories to the children. (R. at 629.)

Simmons testified that often times she felt like "laying down and giving up" because of the pain in her back. (R. at 630.) She stated that she took pain medication which helped her get through the day. (R. at 631.) When asked about her hobbies and activities, Simmons testified that she enjoyed crocheting, and that she used to enjoy roller skating, but could no longer do that because of her back. (R. at 631-32.) Simmons noted that she used to walk from her house to the grocery store, which was about three miles, but had trouble doing that because of her back pain. (R. at 632.) Simmons additionally stated that she had asthma and that she used to smoke, but had not done so in about seven years. (R. at 633.) Simmons stated that she took medication and inhalers to treat her breathing problems. (R. at 634.) With regard to sleeping, Simmons noted that, when attempting to rest, her back hurt and legs cramped up so badly that she often was forced to get up and walk around to stop the pain. (R. at 635.)

Regarding her personal needs, Simmons testified that she could bathe herself, but indicated that she had trouble brushing her hair because of pain in her arm. (R. at 635.) Simmons testified that she did not drink or use drugs. (R. at 635.) Simmons testified that she had a weight problem and explained that to

-6-

remedy this she ate only once a day.  (R. at 638.)  Simmons later testified, with the help of the ALJ and her attorney, that her walk to the grocery store was more likely three-quarters of a mile, rather than three miles, indicating that she could complete the walk in ten minutes.  (R. at 640-41.)

Robert Jackson, a vocational expert, was present and testified at Simmons's hearing.  (R. at 642.)  Jackson classified Simmons's past relevant work as a fast food worker and grocery store clerk as light[4] and unskilled and her work as a child care worker as medium.[5]  (R. at 642.)  Simmons was asked to consider a hypothetical individual of Simmons's age, education and work history who was limited to sedentary work and could lift a maximum of 10 pounds occasionally, lift five pounds frequently; stand two hours in an eight-hour period, and stand for 20 minutes each hour during that time; sit two hours in an eight-hour period, and require breaks of 10 to 15 minutes at approximately two hour intervals; would miss one day of work a month for various reasons; and would require a sit/stand option in the performance of duties where the person could sit or stand, not on a frequent basis, but as an occasional as-needed basis, and could possibly even perform their work in the standing position, or some aspects of the work.  (R. at 643.)  In addition, such a hypothetical person should not be required to use stairs in the performance of her work activity; should not be expected to crawl in performance of her work activities; should not climb ladders or scaffolding; could occasionally bend, stoop or kneel; would have the ability to reach overhead; should not use

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If an individual can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. § 416.967(b) (2008).

[5] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, she also can do light work or sedentary work.  *See* 20 C.F.R. § 416.967(c) (2008).

-7-

automotive equipment in the performance of her work activity; should not work at heights or around unprotected machinery; should not be subjected to temperature extremes, and exposed only to a minimum amount of dust or fumes, due to her asthma; with an IQ range between the mid-70's to low mid-80's, with a full-scale of approximately 77. (R. at 644.) Based on the foregoing hypothetical, the ALJ asked Jackson to identify jobs existing in significant numbers in the regional and national economy that such an individual could perform. (R. at 644.)

Jackson identified work as a general production worker, of which there are approximately 1,500 jobs in Virginia and over 61,000 jobs nationwide. (R. at 644.) Jackson also identified production inspector/grader positions at the sedentary unskilled level, of which there are over 340 positions in Virginia and over 15,000 nationwide. (R. at 645.) Simmons's attorney asked Jackson to consider whether the fact that the hypothetical individual would have to miss between two to three days of work per month would have any impact on his conclusions. (R. at 645.) Jackson stated that such an additional factor would preclude a hypothetical individual from being able to maintain employment. (R. at 645.) Simmons's attorney further asked Jackson to consider the same hypothetical individual but one who would be unable to maintain concentration, persistence and pace for up to a third of the workday. (R. at 645.) Jackson opined that such an individual would not be able to maintain employment. (R. at 645.) Jackson noted that, although the Dictionary of Occupational Titles does not reference jobs that have a sit/stand option, in his opinion and based on his experience, the jobs he listed would typically allow an individual to work from either a seated or standing position. (R. at 646.)

-8-

In rendering his decision, the ALJ reviewed records from Regional Health Resources; Dr. Olimpo Fonseca, M.D.; Dr. Thomas Phillips, M.D., a state agency physician; Dr. Mohammed A. Bhatti, M.D.; Dr. Asghar Ali, M.D.; Phil Pack, M.S.; Lee County Family Care Center; and Lonesome Pine Hospital.

The court's summarization of facts will be limited to the medical evidence of record subsequent to Simmons's amended onset of disability date. On August 4, 2006, Simmons underwent an evaluation at Regional Health Resources. (R. at 475-479.) A mental status examination revealed that Simmons had good eye contact, was cooperative, was oriented as to time, place and person, that her psychomotor activity was normal, and her speech was pressured but she had a goal-directed thought process. (R. at 475-79.) It also was reported that Simmons's mood was dysphoric, but her affect was appropriate and her judgment and cognitive functioning were intact. (R. at 475-79.) She was diagnosed with recurrent major depressive disorder and generalized anxiety disorder. (R. at 479.)

Simmons received treatment from Dr. Olimpo Fonseca, M.D., from September 12, 2005, through December 11, 2006. (R. at 480-500.) During these visits, Simmons complained of, and was assessed with, the following: asthma, chronic obstructive pulmonary disease, ("COPD"), migraine headaches, osteoarthritis, obesity, degenerative disc disease, ("DDD"), glucose intolerance, degenerative joint disease, ("DJD"), of the spine, gastroesophageal reflux disease, ("GERD"), polyuria, polydipsia, chronic low back pain secondary to recurring strains, elevated blood pressure, allergic rhinitis, anxiety disorder, insomnia and a weakened right ankle from recurring strains. (R. at 480-500.) Among the objective observations that Dr. Fonesca noted upon examination included the

-9-

following: Simmons was in no acute distress, her lungs were clear to auscultation and percussion, her heart was regular without murmurs, rubs or gallops, her back was tender around the L4-L5 area on palpation with some paralumbar spasm noted, her deep tendon reflexes were fine and her knees were normal on examination. (R. at 480-500.) A mental health exam revealed that Simmons was oriented to person, place and time, and she had normal psychomotor skills, her speech was normal in rate, volume and tone and her thought processes were goal oriented. (R. at 496.)

On January 16, 2007, Dr. Thomas Phillips, M.D., completed a Physical Residual Functional Capacity Assessment, ("PRFC"), in which he opined that Simmons could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and also noted that she was limited bilaterally in her lower extremities in her ability to push and/or pull. (R. at 505.) Dr. Phillips also opined that Simmons could occasionally climb ramps or stairs, but could never climb ladders, ropes or scaffolds, could occasionally stoop, kneel, crouch and crawl and could frequently balance. (R. at 506.) Dr. Phillips imposed no manipulative, visual, communicative or environmental limitations. (R. at 506-07.)

Dr. Phillips based his findings on Simmons's allegations of disability due to crippling arthritis, two discs disintegrated in her back, asthma, migraines and nerves. (R. at 509.) Dr. Phillips noted that Simmons described daily activities that were significantly limited, and this was consistent with the limitations indicated by the other evidence of record. (R. at 510.) Dr. Phillips additionally noted that Simmons had pursued appropriate follow-up care for her impairments and that her

-10-

treatment had been essentially routine and conservative in nature. (R. at 510.) Based on the evidence of record, Dr. Phillips opined that Simmons's statements were partially credible. (R. at 510.)

Thereafter, a state agency psychologist[6] completed a Psychiatric Review Technique form, ("PRTF"), in which it was noted that Simmons had a mild degree of limitation in her restriction of activities of daily living and in maintaining social functioning; a moderate degree of limitation in maintaining concentration, persistence or pace; and no degree of limitation with her episodes of decompensation, each of extended duration. (R. at 511-21.)

On January 16, 2007, the same state agency psychologist completed a Mental Residual Functional Capacity Assessment, ("MRFC"), in which it was concluded that Simmons was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to understand, remember and carry out detailed instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 524-25.) It also was concluded that Simmons was moderately limited in her ability

---

[6] The name of the reviewing state agency psychologist is unclear from the record.

Case 2:08-cv-00048-GMW-PMS   Document 18   Filed 08/17/09   Page 11 of 32   Pageid#: 79

to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 524-25.) It was additionally concluded that Simmons's ability to be aware of normal hazards and take appropriate precautions, as well as her ability to travel in unfamiliar places or use public transportation was not ratable on available evidence. (R. at 525.)

From September 26, 2007, through October 8, 2007, Simmons presented to Dr. Mohammed A. Bhatti, M.D., with complaints of neck pain, which radiated into the right arm. (R. at 528-30.) Simmons reported having had blunt trauma to the head and neck. (R. at 528.) At one visit, Dr. Bhatti noted that Simmons's strength was 4/5 proximally and distally in the right arm and 5/5 in the left arm, with diminished sensation to sharp stimuli applied to the right and left arm. (R. at 528.) Dr. Bhatti diagnosed Simmons with cervical radiculopathy and recommended a nerve conduction study, ("NCS"), and a follow-up appointment. (R. at 525.) At another visit, Dr. Bhatti noted that an NCS performed on the upper extremities showed normal latency, amplitude and conduction velocities bilaterally, while the same study conducted on the lower extremities showed normal latency and severely diminished amplitude recorded over the right peroneal nerve. (R. at 529.) Dr. Bhatti noted that he was unable to get any response from the right tibial nerve, while the left peroneal and tibial responses were mildly diminished proximally and distally. (R. at 530.) Dr. Bhatti also performed a sensory conduction study on the upper extremities which showed normal latency, amplitude and conduction

-12-

velocities bilaterally, while the same study conducted on the lower extremities showed normal latency and amplitude over bilateral peroneal, superficial peroneal, tibial nerve and left sural nerve. (R. at 530.) At this visit, Dr. Bhatti diagnosed Simmons with moderate L5-S1 nerve root irritation and recommended an MRI of the lumbosacral spine and a neurosurgical evaluation. (R. at 530.)

On September 7, 2007, Simmons visited Dr. Asghar Ali, M.D., for a medical evaluation. (R. at 531-32.) Dr. Ali opined that Simmons was unable to work in any capacity for the duration of her life. (R. at 531.) Dr. Ali diagnosed Simmons with osteoarthritis, rheumatoid arthritis, low back pain, significant chronic disc disease and DDD, with a secondary diagnosis of asthma, pain in both wrists and knees and GERD. (R. at 531.) With regard to her work-related limitations, Dr. Ali opined that Simmons was limited in her ability to lift objects greater than five to 10 pounds, as well as limited in her ability to bend, stoop, reach, partake in activities requiring manual dexterity, sit or stand for greater than one hour at a time, walk distances greater than 50 feet and climb four to six steps. (R. at 532.) Dr. Ali further opined that Simmons's condition did not hinder her ability to care for her children and that Simmons did not require an additional evaluation and/or assessment to determine her current and/or future work capacity. (R. at 532.)

From July 1, 2003, through September 27, 2007, Simmons continued treatment at Lee County Family Care Center by Dr. Ali. (R. at 533-71.) During these visits, Simmons complained of and was assessed with chronic low back pain, anxiety disorder, joint stiffness, nervousness, osteoarthritis, obesity, GERD, severe DDD, gastroenteritis, asthma, upper respiratory infection, insomnia, lower extremity swelling, migraine headaches, COPD, hypertriglyceridemia, bilateral

-13-

knee pain, bilateral wrist pain, herniated nucleus pulposus at L4 and L5, bulging annulus at L5 and S1, hyperlipidemia, depression and right upper extremity weakness causing her to drop things. (R. at 533-71.) On May 30, 2006, an MRI of the lumbar spine revealed an altered signal at the intervertebral discs at L4-L5 and L5-S1; a loss of stature of the disc at L5-S1; a small central herniated nucleus pulposus at the level of L4-L5 with flattening of the anterior margin of the dural sac but no encroachment to the exiting spinal nerves; and moderate bulging annulus fibrosis at the level of L5-S1 that in concert with hypertrophy of the posterior facet joints and ligament flava was causing a moderate degree of narrowing of the neural foramina and encroachment to the epidural fat of the exiting spinal nerves bilaterally at this level. (R. at 547.) On February 21, 2007, a radiograph of the lumbar spine revealed severe chronic disc disease and degenerative change noted at the lumbosacral junction, with no fracture noted and a normal vertebral alignment. (R. at 559.) A radiograph of the right and left hand showed no significant arthritic change but suggested a mild degree of osteophytic change. (R. at 559.) A radiograph of the right knee showed no significant bony or soft tissue abnormalities, while a radiograph of the left knee showed new osteophyte from the tibial plateau which might have represented a very early stage of osteoarthritic changes. (R. at 559.)

On September 8, 2005, and October 14, 2007, Simmons received treatment at Lonesome Pine Hospital with complaints of a toothache and a right ankle sprain. (R. at 572-597.) An x-ray of the right ankle and right foot showed no fractures, dislocations or any other significant abnormalities. (R. at 596.)

-14-

On December 21, 2007, Simmons underwent a psychological evaluation by Phil Pack, M.S. (R. at 599-606.) Simmons reported to Pack that she had always been nervous; that as a child she lived in a very dysfunctional, abusive situation; that she had ongoing symptoms of anxiety, particularly in crowds or around unfamiliar people; that she had acute depression; and that her nerves caused her to drop things. (R. at 600.) Pack noted that Simmons was a high school graduate where she was a special education student. (R. at 600.)

Among Pack's observations upon conducting a mental status examination included: Simmons was cooperative and pleasant and generally seemed forthright in answering questions about herself and her background; Simmons appeared overweight and her personal hygiene was adequate; Simmons ambulated without assistance with no remarkable deficit; her speech was clear; her predominant mood was quiet but pleasant; her affect was broad and appropriate to topic; no formal thought disorder was detected; Simmons reported generalized symptoms of anxiety dating back to a dysfunctional family or origin; she did not describe clear post traumatic stress disorder or obsessive/compulsive disorder symptoms; she denied any suicidal or homicidal ideation; she did not report any delusional systems; her level of consciousness was alert; she was oriented to time, place and person; her short-term and long-term memory was normal; and her immediate retention and recall was normal with the context of her limited cognitive abilities. (R. at 601-02.)

Simmons was administered the Reading Subtest of the Wide Range Achievement Test, 3rd Edition ("WRAT-3"), which is used to assess an individual's general reading skills. (R. at 602.) On this test, Simmons received a

Reading Score indicating third-grade reading capabilities. (R. at 602.) Simmons also was administered the Mini Mental Status Examination, which is used to assess an individual's degree of cognitive impairment. (R. at 602.) Simmons received a score in the Normal Range, which was not indicative of significant cognitive dysfunction. (R. at 602.) Simmons also was administered the Wechsler Adult Intelligence Scale, 3rd Edition, ("WAIS-III"), which is used to measure intellectual abilities. Simmons scored a 68 on the Verbal portion and a 69 on the Performance portion, with a Full Scale score of 66. (R. at 602-03.) Simmons also was administered the Symptom Checklist, 90-R, ("SCL-90-R"), which is a self-report symptom inventory designed to assess patterns of psychological symptoms and distress. (R. at 603.) Simmons received a score of "Significant" on the scales of Somatization, interpersonal sensitivity, anxiety, global severity index, positive symptom distress index and positive symptom total, while she received a score of "Non-Significant" on the scales of obsessive-compulsive, depression, hostility, phobic anxiety, paranoid ideation and psychoticism. (R. at 603.) Lastly, Simmons was administered the Derogatis Psychiatric Rating Scale, ("DPRS"), which attempts to systematically verify some of the response patterns on the SCL-90-R through interview. (R. at 604.) It was noted that Simmons presented with a chronic history of anxiety along with some somatic concerns. (R. at 604.) Additionally, it was noted that her personality structure did not seem to be characterized by significant dysfunction but rather she seemed to be a woman of limited cognitive abilities who had perhaps maximized her adaptive behavior potential. (R. at 604.)

Pack diagnosed Simmons with anxiety disorder, not otherwise specified, mild mental retardation and orthopedic difficulties by history. (R. at 604.) Pack

-16-

noted that Simmons was of below average cognitive abilities and testing placed her in the mild mental retardation range.  (R. at 604.)  Pack noted that her adaptive behavior and history might argue against a formal diagnosis of mental retardation but her general ability to understand and acquire information seemed limited.  (R. at 604.)  Additionally, he observed that Simmons presented with chromic symptoms of anxiety and her prognosis seemed to be guarded to poor for significant improvements.  (R. at 604.)  Lastly, Pack stated that, since Simmons had not had the benefit of formal mental health services, she likely would benefit from ongoing treatment aimed at symptomatic improvement in regards to her anxiety.  (R. at 604.)

On December 21, 2007, Pack performed a Medical Assessment of Ability to do Work-Related Activities (Mental), in which he opined that Simmons had a fair ability to follow work rules, relate to co-workers, interact with supervisors, deal with work stress, maintain attention/concentration, understand, remember and carry out simple job instructions and behave in an emotionally stable manner; a poor ability to deal with the public, use judgment, understand, remember and carry out detailed, but not complex, job instructions, relate predictably in social situations and demonstrate reliability; a fair to poor ability to function independently; a poor to no ability to understand, remember and carry out complex job instructions; and a good ability to maintain personal appearance.  (R. at 605-06.)

### III.  Analysis

-17-

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 27, 2008, the ALJ denied Simmons's claim. (R. at 16-21.) After consideration of the entire record, the ALJ found that Simmons had not performed substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that the medical evidence established that Simmons had severe impairments, namely a back disorder and anxiety, but he found that

-18-

Simmons's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Simmons maintained the residual functional capacity to perform the requirements of a limited range of sedentary work, whereby she could lift and carry up to 10 pounds occasionally, and five pounds frequently, sit for two hours at a time up to a total of six hours in an eight-hour period and stand and/or walk for 20 minutes at a time up to a total of two hours in an eight-hour period. (R. at 20.) The ALJ further found that Simmons was unable to perform jobs that require crawling, climbing stairs, exposure to heights or hazardous machinery, operating automotive equipment, exposure to dust, fumes or temperature extremes, or more than occasional bending, stooping or kneeling. (R. at 20.) Additionally, the ALJ found that Simmons was precluded from the performance of her past relevant work as a fast food worker, child care worker and grocery store clerk. (R. at 20.) The ALJ opined that, although Simmons could not perform the full range of work at the sedentary level of exertion, she retained the ability to perform a significant number of jobs in the national economy, such as a material handler, general production worker and inspector/grader. (R. at 21.) Thus, based on these findings, the ALJ determined that Simmons was not under a "disability" as defined by the Act and was not eligible for SSI benefits. (R. at 21.) *See* 20 C.F.R. § 416.920(g) (2008).

Simmons argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Memorandum in Support of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief"), at 8.) Specifically, Simmons's argues that the ALJ erred in failing to discuss Simmons's work-related mental limitations in his RFC determination. (Plaintiff's Brief at 9.) Simmons

further argues that the ALJ improperly rejected the opinion of Mr. Pack, and that if the ALJ had reason to question Pack's findings, he should have ordered a consultative examination rather than render his own medical opinion. (Plaintiff's Brief at 12.) Simmons also argues that the ALJ was required to consider her work-related mental limitations in making his RFC determination based upon the fact that the ALJ classified her anxiety as "severe" at step two. (Plaintiff's Brief at 14.) In addition, Simmons argues that the ALJ improperly ignored work-related mental limitations noted by a non-examining state agency psychologist. (Plaintiff's Brief at 13.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion,

even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

At the outset, the undersigned notes that Simmons refers to medical records that pre-date August 18, 2005, the alleged onset date of disability. For the purposes of this analysis, any records that pre-date the alleged onset date of disability will not be considered, as they are not within the relevant time period for this court's consideration. Simmons first argues that, by rejecting the opinion of Mr. Pack, the ALJ failed to properly consider her work-related mental limitations and further argues that the ALJ failed to mention the January 16, 2007, report from a state agency psychologist.

In the ALJ's written opinion, he stated that "both the diagnoses and assessment are inconsistent with the objective clinical findings recorded by Mr. Pack and the evidence of record prior to the evaluation." (R. at 19.) As a result, the ALJ stated that Pack's "opinion concerning the claimant's work-related limitations is accorded very little weight." (R. at 19.) This was a proper finding by the ALJ, as Pack's findings were inconsistent with other evidence of record, and his opinions were internally inconsistent with his clinical findings. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. § 416.927(c)(2). In fact, Pack's treatments notes and findings contained several inconsistencies, i.e. his opinions were not consistent with his clinical findings and treatment notes. Simmons's argument focuses on the ALJ's opinion that this is a case of "doctor shopping." (Plaintiff's Brief at 12.) Whether or not that is the case, the ALJ

-21-

rejected the opinion of Pack for good reason, as his findings were internally inconsistent.

Simmons also argues that the ALJ failed to even mention the January 16, 2007, report from a state agency psychologist in his opinion. In determining whether substantial evidence supports the Commissioner's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In fact, the Commissioner "must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). The United States Court of Appeals for the Fourth Circuit has stated that,

> The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

While Simmons is correct in pointing out that the ALJ omitted this piece of evidence, the undersigned does not find that, had the ALJ considered such evidence, it would have changed the hypothetical that he posed to the vocational expert. Although the ALJ has a duty to consider all relevant evidence of record, the opinion of the state agency psychologist is very consistent with several of the findings of Pack and would not likely change the conclusion that Simmons was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to understand and remember detailed instructions, to carry out very short and simple instructions, to carry out detailed instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 524-25.)

It is readily apparent to the undersigned that the ALJ's consideration of the state agency psychologist would only further justify his finding and

limitation of borderline intellectual functioning that he posed in his hypothetical to the vocational expert. The undersigned notes that the state agency psychologist did place certain limitations on Simmons when it was noted that Simmons was moderately limited to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 524-25.) However, regardless of whether or not the ALJ considered this report, there is enough evidence to support the ALJ's findings and limitations, and therefore, his alleged failure to consider or specifically mention such evidence constitutes harmless error and is immaterial to the ultimate outcome of the case. Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error. *See Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va. Oct. 18, 2007) (citing *Camp v. Massanari*, 2001 WL 1658913 (4th Cir. Dec. 27, 2001)) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

Simmons further argues that because the ALJ classified her anxiety as "severe" at step two of the sequential evaluation process, he was required to consider Simmons's work-related mental limitations in making an RFC determination. (Plaintiff's Brief at 14.) This argument is misplaced, as a

step-two finding of severe impairments is merely a threshold test. Under this test, if no impairment is found to be "severe," by which a claimant has no impairment that significantly limits her physical or mental ability to perform basic work activities, that claimant is deemed "not disabled" and the evaluation process ends. 20 C.F.R. § 416.920(c)(2008). Therefore, a finding of a "severe" impairment merely allows the ALJ to proceed to the next step, rather than mandate upon him a duty to factor in all "severe" impairments into his RFC determination. After finding Simmons's anxiety to be "severe," he further considered her work-related mental impairments as they were reported by Pack. (R. at 18.) After consideration of these impairments, the ALJ considered Simmons to be of borderline intellectual functioning and asked the vocational expert to factor into his hypothetical a person with a full scale IQ of 77 in order to make an RFC determination. (R. at 644.) Therefore, even though the ALJ was not required to make a finding regarding Simmons's mental limitations simply because he found her anxiety to be "severe," he nevertheless factored in Simmons's mental limitations in making his RFC determination.

Among the other evidence upon which the ALJ relied in making his determination regarding mental impairments includes an evaluation Simmons underwent at Regional Health Resources on August 4, 2006. (R. at 475-479.) At this visit, a mental status examination revealed that Simmons had good eye contact, was cooperative, was oriented as to time, place and person, that her psychomotor activity was normal, and her speech was pressured but she had a goal-directed thought process. (R. at 475-79.) It also was reported that Simmons's mood was dysphoric, but her affect was

appropriate and her judgment and cognitive functioning were intact. (R. at 475-79.)

In making his RFC determination, the ALJ asked the vocational expert to consider a hypothetical individual of Simmons's age, education and work history who was limited to sedentary work, and placed the additional limitation of someone with an IQ range between the mid-70's to low mid-80's, with a full-scale of approximately 77. (R. at 644.) Based on the foregoing hypothetical, the ALJ asked the vocational expert to identify jobs existing in significant numbers in the regional and national economies that such an individual could perform. (R. at 644.) The vocational expert testified that such a person would be able to perform work as a material handler, general production worker and inspector/grader. (R. at 644-45.) Relying upon the testimony of the vocational expert, the ALJ made his RFC determination in which he opined that, although Simmons could not perform the full range of work at the sedentary level of exertion, there were a significant number of jobs in the national economy that she could perform, such as a material handler, general production worker and inspector/grader. (R. at 21.) Therefore, the undersigned finds that the ALJ properly factored in Simmons's mental limitations when he asked the vocational expert to consider a hypothetical with an IQ range between the mid-70's to low mid-80's, with a full-scale of approximately 77. (R. at 644.) Although he failed to fully explain his basis upon making such a determination, there is sufficient evidence to support his finding.

Next, Simmons argues that the ALJ erred by failing to adequately discuss her work-related physical limitations in making his RFC

determination. (Plaintiff's Brief at 16.) Specifically, Simmons argues that the ALJ omitted the consideration of the report of a non-examining state agency physician, and failed to fully discuss limitations noted by certain treating physicians. (Plaintiff's Brief at 17.)

With regard to the omission of the physical limitations noted by the state agency physician, the undersigned finds that Simmons is correct in noting such an omission, however, it would not change the ALJ's RFC determination. On January 16, 2007, Dr. Thomas Phillips, M.D., completed a PRFC, in which he opined that Simmons could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and that she was limited bilaterally in her lower extremities in her ability to push and/or pull. (R. at 505.) Dr. Phillips also opined that Simmons could occasionally climb ramps or stairs, but could never climb ladders, ropes or scaffolds, could occasionally stoop, kneel, crouch and crawl, and could frequently balance. (R. at 506.)

While Simmons is correct in noting the ALJ's omission of these work-related limitations, the undersigned finds that the ALJ properly accounted for such limitations in his hypothetical to the vocational expert, where he stated that such a hypothetical person should not be required to use stairs in the performance of her work activity; should not be expected to crawl in performance of her work activities; should not climb ladders or scaffolding; and could occasionally bend, stoop or kneel. (R. at 644.) Therefore, the inclusion of Dr. Phillips's findings in the ALJ's opinion would not have altered the ALJ's RFC determination.

Simmons also argues that the ALJ failed to fully discuss limitations noted by treating physicians Dr. Khan and Dr. Ali.  Specifically, Simmons focuses on Dr. Ali's opinion that Simmons was unable to work in any capacity for the duration of her life, and with regard to her work-related limitations, Dr. Ali's opinion that Simmons was limited in her ability to lift objects greater than five to 10 pounds, as well as limited in her ability to bend, stoop, reach, partake in activities requiring manual dexterity, sit or stand for greater than one hour at a time, walk distances greater than 50 feet and climb four to six steps.  (R. at 532.)

The undersigned finds that, although the ALJ did not discuss every detail of Dr. Ali's opinion, he sufficiently discussed a majority of Dr. Ali's findings that allowed him to make a proper RFC determination.  In posing his hypothetical question to the vocational expert, the ALJ sufficiently factored in similar limitations as those found by Dr. Ali.  While Dr. Ali noted that Simmons could not sit or stand for more than one hour at a time, the ALJ, in his hypothetical, included a sit/stand option, whereby "the person could sit or stand, not on a frequent basis, but as an occasional as-needed basis, and could possibly even perform their work in the standing position, or some aspects of the work."  (R. at 643.)  Such a sit/stand option sufficiently factors in Dr. Ali's limitation of sitting or standing for no more than one hour at a time.

Additionally, Dr. Ali opined that Simmons was limited in her ability to climb four to six steps.  (R. at 532.)  In the ALJ's hypothetical to the vocational expert, he stated that such a hypothetical person should not be

required to use stairs in the performance of her work activity and should not climb ladders or scaffolding. (R. at 644.) Therefore, it is clear that the ALJ provided even more restrictive limitations in his hypothetical than those noted by Dr. Ali. As such, the undersigned finds that the ALJ adequately factored in the opinion of Dr. Ali regarding Simmons's work-related physical limitations.

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[7] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, the ALJ opined that there were no objective clinical findings to support much of Dr. Ali's opinion. While a February 21, 2007,

---

[7] *Hunter* was superseded by 20 C.F.R. § 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

radiograph of the lumbar spine revealed severe chronic disc disease and degenerative change noted at the lumbosacral junction, the ALJ found that "Dr. Ali recorded no objective clinical findings relative to the musculoskeletal spine or neurological system at the next visit on March 21, 2007, and he indicated that lower back pain could be managed with prescription medication." (R. at 17.) In addition, the ALJ found that progress notes of several visits between April 2, 2007, and August 27, 2007, "contain no objective clinical findings relative to the musculoskeletal spine or neurological system." (R. at 17.) Despite the lack of objective clinical findings, the ALJ noted that Dr. Ali still placed the limitations on Simmons with regard to lifting, walking and standing. (R. at 17.)

The ALJ additionally discussed a May 30, 2006, MRI of the lumbar spine which revealed an altered signal at the intervertebral discs at L4-L5 and L5-S1; a loss of stature of the disc at L5-S1; a small central herniated nucleus pulposus at the level of L4-L5 with flattening of the anterior margin of the dural sac but no encroachment to the exiting spinal nerves; and moderate bulging annulus fibrosis at the level of L5-S1 that in concert with hypertrophy of the posterior facet joints and ligament flava was causing a moderate degree of narrowing of the neural foramina and encroachment to the epidural fat of the exiting spinal nerves bilaterally at this level. (R. at 547.)

Thus, after considering the clinical findings of Dr. Ali, as well as the other objective evidence, the undersigned finds that the ALJ properly considered all the evidence, and was justified in according less weight to Dr. Ali as a treating physician. Although Dr. Ali noted problems consistent with

Simmons's back disorder, none of his findings would preclude Simmons's ability to perform sedentary work.

With regard to Dr. Bhatti's findings, the ALJ also adequately considered them and accorded them proper weight. The ALJ did not find any evidence in Dr. Bhatti's findings that would preclude Simmons from performing sedentary work.

From September 26, 2007, through October 8, 2007, Simmons presented to Dr. Bhatti with complaints of neck pain that radiated into the right arm. (R. at 528-30.) At one visit, Dr. Bhatti noted that Simmons's strength was 4/5 proximally and distally in the right arm and 5/5 in the left arm, with diminished sensation to sharp stimuli applied to the right and left arm. (R. at 528.) At another visit, Dr. Bhatti noted that a nerve conduction study performed on the upper extremities showed normal latency, amplitude and conduction velocities bilaterally, while the same study conducted on the lower extremities showed normal latency and severely diminished amplitude recorded over the right Peroneal nerve. (R. at 529.) Dr. Bhatti also performed a sensory conduction study on the upper extremities which showed normal latency, amplitude and conduction velocities bilaterally, while the same study conducted on the lower extremities showed normal latency and amplitude over Bilateral Peroneal, Superficial peroneal, Tibial nerve and left Sural nerve. (R. at 530.) At this visit, Dr. Bhatti diagnosed Simmons with moderate L5-S1 nerve root irritation and recommended an MRI of the lumbosacral spine and neurosurgical evaluation. (R. at 530.)

The undersigned finds that the ALJ adequately examined the treatment notes of Dr. Bhatti and adequately accounted for the functional limitations contained within his assessment. The undersigned sees nothing in Dr. Bhatti's findings that was not accounted for and encompassed in the ALJ's hypothetical to the vocational expert. Thus, I am of the opinion that Dr. Bhatti's findings were properly considered and that the ALJ's decision is supported by substantial evidence.

*V. Conclusion*

For these reasons discussed above, I will sustain the Commissioner's motion for summary judgment and decision to deny benefits, and I will overrule Simmons's motion for summary judgment.

An appropriate order will be entered.

DATED: This 17th day of August 2009.

/s/  *Glen M. Williams*
SENIOR UNITED STATES DISTRICT JUDGE